## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JUAN E. M., | : |
| | : |
| Petitioner, | :  Civ. No. 20-4594 (KM) |
| | : |
| v. | : |
| | : |
| THOMAS DECKER, *et al.*, | :  **OPINION** |
| | : |
| Respondents. | : |
| | : |

**KEVIN MCNULTY, U.S.D.J.**

### I.    INTRODUCTION

Petitioner, Juan E. M.,[1] is an immigration detainee currently held at the Essex County Correctional Facility, in Newark, New Jersey. He is proceeding by way of counsel with a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241. (DE 1.) Respondents oppose the petition. (DE 7.) Pursuant to Local Civil Rule 78.1, this matter is decided without oral argument. For the reasons set forth below, the petition will be granted insofar as it seeks a preliminary injunction requiring Petitioner's temporary release. This decision should not be taken as signifying a result in any other individual case; rather, it is a reflection of the unique circumstances present in this particular case.

### II.    BACKGROUND

#### A.    COVID-19

The United States is currently in the midst of a pandemic caused by an infectious disease known as COVID-19. *See* Ctrs. for Disease Control and Prevention, *Situation Summary*,

---

[1]     Consistent with guidance regarding privacy concerns in social security and immigration cases by the Committee on Court Administration and Case Management of the Judicial Conference of the United States, Petitioner is identified herein only by his first name and last initial.

https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html (last visited May 7, 2020). COVID-19 is a respiratory disease which is thought to spread "mainly through close contact [within about six feet] from person-to-person in respiratory droplets" and from contact with contaminated surfaces. *See* Ctrs. for Disease Control and Prevention, *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html    (last visited May 7, 2020). Even individuals who are asymptomatic may be able to spread the virus. *See id.* The disease is spreading "very easily and sustainably between people." *See id.* Within the United States to date, over 1,190,000 people have tested positive for COVID-19 and over 70,800 individuals have died as a result. *See* Ctrs. for Disease Control and Prevention, *Cases in U.S.*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited May 7, 2020).

Common symptoms of COVID-19 include a fever, cough, and shortness of breath. *See* Ctrs. for Disease Control and Prevention, *Symptoms of Coronavirus*, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last visited May 7, 2020). The Centers for Disease Control and Prevention ("CDC") has identified certain groups of individuals who are deemed to be at "higher risk for severe illness" if they contract COVID-19. *See* Ctrs. for Disease Control and Prevention, *Groups at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited May 7, 2020). These high risk individuals include, but are not limited to, those who are over 65 years of age, have asthma, or are immunocompromised. *See id.*

In order to prevent the spread of the virus, the CDC recommends "social distancing" (staying at least six feet away from others), wearing cloth face coverings when in public, regular disinfection of "frequently touched surfaces," and washing hands often with soap and water,

among other practices. *See* Ctrs. for Disease Control and Prevention, *Prevent Getting Sick*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/disinfecting-your-home.html (last visited May 7, 2020). Obviously, however, "[t]he best way to prevent illness is to avoid being exposed to this virus." *See id.*

**B.    Background**

     *i.    Procedural History*

Petitioner is a 28-year-old native and citizen of Mexico. (DE 7-6 at 2.) Although he arrived in the United States on an unknown date and time, Petitioner states that he has lived in the United States since he was sixteen years old. (DE 11 at 9.) He is the father of a six-year-old daughter who is a United States citizen. (*Id.*)

On August 25, 2014, Petitioner was arrested and charged with Criminal Possession of a Weapon in the Third Degree, in violation of N.Y. Penal Law § 265.02, and Criminal Possession of a Weapon in the Fourth Degree, in violation of N.Y. Penal Law § 265.01. (DE 7-8 at 5.) He pleaded guilty on December 25, 2014 to Attempted Criminal Possession of a Weapon in the Fourth Degree, in violation of N.Y. Penal Law § 265.01. He was sentenced to eight months' imprisonment. (*Id.* at 6.)

On February 20, 2020, Petitioner was arrested and subsequently arraigned on charges of Criminal Mischief in the Fourth Degree, in violation of N.Y. Penal Law § 145.00; Attempted Assault in the Third Degree, in violation of N.Y. Penal Law § 120.00; and Harassment in the Second Degree, in violation of N.Y. Penal Law § 240.26. (*Id.* at 3–4.) Petitioner was released on his own recognizance and these charges remain pending. (*Id.*)

On February 27, 2020, Petitioner was taken into custody by Immigration and Customs Enforcement ("ICE") and placed into removal proceedings. (DE 7-6 at 2–3.) He was served with

a Notice to Appear which charged him with removability under section 212(a)(6)(A)(i) of the Immigration and Nationality Act ("INA") for having entered the United States without authorization. (*Id.* at 2.) Petitioner has remined in ICE custody pursuant to 8 U.S.C. § 1226(a) since that time. (DE 7 at 11.) He is currently being detained at the Essex County Correctional Facility ("ECCF"). (DE 11 at 9.)

On April 17, 2020, Petitioner had a hearing before the immigration court where he admitted the charges in the Notice to Appear and indicated that he would be filing an application for relief. (DE 7 at 12.) Respondents indicate that Petitioner does not appear to have filed an application for a bond hearing with the immigration court. (*Id.*)

On April 21, 2020, Petitioner filed the instant habeas petition filed pursuant to 28 U.S.C. § 2241. (DE 1.) He seeks immediate release from custody based upon alleged unconstitutional conditions of confinement and inadequate medical care. (*Id.*) On April 24, 2020, Respondents filed opposition to the petition. (DE 7.) Petitioner thereafter filed a reply, as well as a supplemental exhibit. (DE 11; DE 13.)

ii.      *Petitioner's Health*

Petitioner indicates that in early April 2020 he began experiencing symptoms consistent with those of COVID-19. (DE 1 at 4.) Petitioner's medical records from ECCF show that on April 1, 2020, he sought medical care for a sore throat and a cough. (DE 11-1 at 14.) On April 2, 2020, he was treated by a medical professional. (*Id.*) His temperature was 97.5 degrees and his oxygen saturation reading was 98%. (*Id.*) He was diagnosed with an upper respiratory infection and back pain, prescribed medication for his symptoms, and instructed to stay well-rested and hydrated. (*Id.* at 16.)

A declaration from Petitioner's attorney indicates that Petitioner may have requested to see a doctor on April 12, 2020 because he was still experiencing symptoms, although this is not noted in his medical records. (DE 11-6 at 2; DE 11-1.) Petitioner's records indicate that he next requested to see a doctor on April 19, 2020. (DE 11-1 at 18.) At that time, he stated that he was no longer experiencing a sore throat but that his cough and a "stuffy nose" persisted. (*Id.*) He also indicated that he was no longer receiving medicine for his symptoms. (*Id.*) Petitioner was seen on April 22, 2020 by a doctor. (DE 8 at 2.) His temperature was 97.3 degrees and his oxygen saturation reading was 88%. (*Id.*) The doctor noted Petitioner had "some shortness of breath" but that his lungs were clear and his respiratory effort was "good." (*Id.*) Petitioner's diagnosis was "Upper Respiratory Infection, Rule out – Bronchitis." (*Id.*) The practitioner ordered a chest X-ray and lung exam and prescribed Petitioner medication for his symptoms. (*Id.*) The chest X-ray and lung exam returned with normal results. (*Id.*; DE 11-2 at 2.)

Petitioner contends that he is at higher risk of suffering severe illness if he contracts COVID-19 because he is obese and has a history of smoking. (DE 11 at 10; DE 11-2 at 1.) His medical records from ECCF indicate that his body mass index is 31.2, and that he has a history of smoking. (DE 11-1 at 3, 6; DE 11-2 at 1.) As further evidence of his medical conditions, Petitioner also provides a statement from Dr. Kirsten Hansen Day who reviewed Petitioner's medical records. (DE 11-2.) She indicates that Petitioner's health issues place him at "higher risk of severe disease." (DE 11-2 at 1.) Dr. Day states that "there is a high frequency of patients with obesity who require hospitalization and then intensive care for COVID-related complications." (*Id.*) She also provides that a recent study "found that past or current smokers have double the risk for severe COVID-19 disease compared to people who have never smoked." (*Id.*)

5

Dr. Day also indicates that Petitioner's oxygen saturation of 88% on April 22, 2020 is "critically low." (*Id.* at 1–2.) She states that the way COVID-19 attacks the lungs "can cause infected people to have critically low oxygen levels while appearing to only have mild symptoms, a phenomenon referred to as 'silent hypoxemia.'" (*Id.* at 2.) As a result, patients may "appear stable but then require intensive care or die from lung failure within hours." (*Id.*) Dr. Day finds it concerning that, given Petitioner's symptoms, he was not referred to a hospital for care, tested for COVID-19, been quarantined, or provided with protective equipment. (*Id.*)

Dr. Day submits that detention care environments can result in delays in medical care and that it is clear Petitioner "will (or may already) need immediate access to a higher level of care should he begin to experience difficulty breathing." (*Id.*) She opines that Petitioner's medical care cannot be adequately addressed while in detention, given his increased risk for severe disease and "the already evident delays in adequate diagnosis and management of his symptoms." (*Id.*) Dr. Day states that the "safest situation" for Petitioner and the detained population as a whole, would be to release Petitioner. (*Id.*)

## C.   Conditions at ECCF

### i.   *Respondents' Evidence Regarding the Conditions at ECCF*

To describe the measures ECCF has implemented to combat the spread of COVID-19, Respondents provide the declaration of Alfaro Ortiz, the Director of ECCF. (DE 7-5.) Mr. Ortiz states that since March 2020, ECCF has taken various measures to ensure the health and safety of detainees during the COVID-19 outbreak. (*Id.* at 4.) The facility is sanitizing housing units no fewer than three times per day, cleaning and disinfecting high touch surface areas, and sanitizing the kitchen every hour. (*Id.* at 6.) ECCF has also suspended all classes and religious services taught by outside volunteers; suspended outside work programs for inmates and detainees; transitioned

attorney and contact visits to window only visits; limited entrance to ECCF for staff and employees to one monitored door; and initiated health screenings for correctional officers, civilians, and outside vendors each time they enter the facility. (*Id.* at 5–6.)

Mr. Ortiz states that despite allegations from some detainees that there is insufficient soap and disinfectant, "[t]hat is not true." (*Id.* at 10.) Mr. Ortiz provides that detainees have unlimited access to soap and water, and some detainees keep multiple bars of soap in their personal area. (*Id.*) He states that ECCF is receiving deliveries of soap every three days and that there is enough soap for each detainee to have at least three bars at all times. (*Id.* at 11.) The facility is encouraging detainees to use soap as frequently as possible and individuals can request additional soap at any time. (*Id.*) He also indicates that disinfectant spray is available for detainees to use upon request. (*Id.* at 10–11.) Detainees cannot keep the disinfectant spray with them because it contains bleach and is a safety hazard. (*Id.* at 11.) However, at the beginning of each correctional officer's shift, they are issued a bottle of disinfectant spray to use throughout their shift. (*Id.* at 12.) The spray bottle is replenished throughout the day and ECCF is encouraging staff and detainees to use the spray often and liberally. (*Id.*)

With respect to social distancing, meals are now provided to detainees within their cells or in the passive recreation area of the housing unit where there is ample space to sit at least six feet apart. (*Id.*) ECCF has modified recreation groups to limit close interaction with other detainees and has reduced the number of individuals permitted to take recreation at the same time. (*Id.* at 8.) ECCF has also educated staff and detainees on best practices to prevent the spread of COVID-19, including the importance of social distancing and hand washing. (*Id.* at 5.) The facility is providing handouts in multiple languages which reiterate this information and is playing public service announcements to this effect on video screens throughout the facility. (*Id.* at 3.)

As for medical care, ECCF is following the guidance issued by the CDC. (*Id.* at 9.) Detainees who complain of illness are "immediately evaluated by medical staff." (*Id.*) If a detainee exhibits signs or symptoms of COVID-19, they are provided with a surgical mask. (*Id.*) Individuals with moderate to severe symptoms are transported to the local hospital for evaluation. (*Id.*) Individuals with mild symptoms are placed in a designated quarantine area and isolated from others. (*Id.*) Anyone who is symptomatic and awaiting test results are started on anti-viral medications and their vitals are monitored on a daily basis. (*Id.*) Detainees who are asymptomatic, but have been exposed to someone with confirmed COVID-19, are housed together in a practice referred to as "cohorting." (*Id.* at 10.) If, after fourteen days, no new cases develop, cohorting is discontinued. (*Id.*) Any detainees with health conditions identified by the CDC as placing them at higher risk of developing serious illness of COVID-19 are being housed separately. (*Id.* at 14.) Additionally, the staff have been provided with the appropriate personal protective equipment. (*Id.* at 10.)

Finally, Mr. Ortiz indicates that as of 9:00 am on April 19, 2020, ECCF has identified three ICE detainees that have tested positive for COVID-19; five inmates have tested positive; fifty-five correctional staff members have testified positive; and two civilian staff have tested positive. (*Id.* at 13.) Mr. Ortiz further provides that although there is no mandate for testing the entire ECCF population, the facility is nevertheless "rolling out rapid COVID-19 testing" for all inmates and detainees. (*Id.* at 13–14.) It is a blood test that will be used as a "supplementary screening tool" and to determine detainees' housing based upon their results. (*Id.* at 14.)

    ii.   *Petitioner's Evidence Regarding the Conditions at ECCF*

In support of his petition, Petitioner has submitted several declarations regarding the conditions at ECCF. (DE 11-3; DE 11-4; DE 11-5; DE 11-6; DE 11-8; DE 11-8; DE 11-10; DE

11-11; DE 13-1.) Multiple declarations are from former detainees who were recently released from ECCF. (DE 11-4; DE 11-5; DE 11-10; DE 11-11.) The declarations of former detainees indicate that they were unable to practice social distancing either in their cells or while out of their cells in the recreation room. (DE 11-4 at 4; DE 11-5 at 1; DE 11-10 at 4–5; DE 11-11 at 1.) They assert that commonly touched surfaces in the recreation room were only cleaned a few times per day at best, and they were not provided with disinfectant spray to clean surfaces, even upon request. (DE 11-4 at 4–5; DE 11-5; DE 11-10 at 5; DE 11-11 at 2.) Detainees were also only provided with one bar of soap per week. (DE 11-4 at 5; DE 11-5 at 2; DE 11-10 at 5.) The declarations further indicate that individuals who became sick were not treated immediately. (DE 11-4 at 5; DE 11-5 at 2; DE 11-11 at 2.) Rather, it took a few days before a symptomatic individual was taken to the medical unit and while they waited, the symptomatic detainees were mingling with the rest of the population. (DE 11-4 at 5; DE 11-5 at 2; DE 11-11 at 2.) The detainees also indicated that they were not provided with masks or gloves. (DE 11-5 at 2; DE 11-10 at 4.)

Petitioner also provides the declaration of Gregg S. Gonsalves who is an epidemiologist at the Yale School of Medicine and School of Public Health. (DE 13-1.) Mr. Gonsalves delineates the grave risks posed by infectious diseases within jails and prisons. (*Id.*)  He also specifically reviewed Mr. Ortiz's declaration and states that the risk presently posed by COVID-19 in facilities such as ECCF is "unconscionable." (*Id.* at 12.) Mr. Gonsalves posits that ECCF's plans to use antibody testing is not an appropriate way to diagnose active infection or to ascertain whether someone has been exposed to, or is recovering from, COVID-19. (*Id.* at 13-1.) Mr. Gonsalves points out several flaws in the the measures taken at ECCF. For example, he states that despite Mr. Ortiz's assertion that high touch surfaces are disinfected and detainees are encouraged to use disinfectant solution often, Mr. Ortiz "does not provide any detail on the frequency of cleaning or

a procedure to ensure that surfaces and items are regularly and properly sanitized." (*Id.* at 20.) Additionally, he states that Mr. Ortiz fails to demonstrate how social distancing is practiced or enforced. (*Id.* at 21.) Mr. Gonsalves provides that "[g]enerally social distancing is impossible to obtain in a jail or prison setting, and [Mr. Ortiz's declaration does not] provide any evidence to alter my view." (*Id.*)  Mr. Gonsalves was also particularly concerned that Mr. Ortiz's declaration only stated, in a cursory fashion, that individuals identified as high risk by the CDC are "monitored" and that an unidentified plan exists to remove these individuals from the general population "if necessary." (*Id.* at 23.) Mr. Gonsalves opines that "these provisions are inadequate, and the lack of sufficient protections [at ECCF] constitutes an indefensible misjudgment, and one that must be rectified immediately." (*Id.*)

Additionally, Petitioner provides the declaration of Dr. Jaimie Meyer who also reviewed Mr. Ortiz's April 20, 2020 declaration. (DE 11-8.) Dr. Meyer's declaration describes the limitations of the antibody tests being administered by ECCF. (*Id.*) She states that these tests cannot be the sole basis for determining whether in individual currently has COVID-19, does not have COVID-19, or has recovered from COVID-19. (*Id.* at 11.) She warns that relying on this testing can result in detainees with COVID-19 being placed alongside others who are at risk of exposure or placed back into the general population, and it can lead to individuals who are actually not immune being informed that they are. (*Id.*) Dr. Meyers states that ECCF has "recklessly implemented a protocol that in several core respects is inconsistent with clear warnings from the CDC, FDA, and WHO." (*Id.*) She opines that "far from preventing the spread of COVID-19, ECCF's stated testing protocol would significantly increase the risk of COVID-19 in the facility more so than if there was no testing at all." (*Id.* at 12.)

### III.    JURISDICTION

Generally, conditions of confinement claims are brought pursuant to 8 U.S.C. § 1983. *See Camacho Lopez v. Lowe*, Civ. No. 20-563, 2020 WL 1689874, at *4–5 (M.D. Pa. Apr. 7, 2020). However, where an individual seeks "immediate or more speedy release," he is asserting a remedy available through a habeas petition. *See Preiser v. Rodriguez*, 411 U.S. 475, 494 (1973). A habeas petition is the process by which an individual may challenge the "fact or length" of his confinement. *See id.* To date, the United States Supreme Court has not expressly stated whether a conditions of confinement claim may be raised through a habeas corpus petition. *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1862-63 (2017) ("[W]e have left open the question whether [individuals] might be able to challenge their confinement conditions via a petition for a writ of habeas corpus."); *see also Bell v. Wolfish*, 441 U.S. 520, 526 n.6 (1979) ("[W]e leave to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement."); *Preiser*, 411 U.S. at 499 ("When a prisoner is put under additional and unconstitutional restraints during his lawful custody, it is arguable that habeas corpus will lie to remove the restraints making custody illegal."). However, federal courts of appeals appear to have condoned such challenges. *See Aamer v. Obama*, 742 F.3d 1023, 1032 (D.C. Cir. 2014); *Woodall v. Fed. Bureau of Prisons*, 432 F.3d 235, 242-44 (3d Cir. 2005); *Ali v. Gibson*, 572 F.2d 971, 975 n.8 (3d Cir. 1978). Moreover, recent caselaw within this circuit has been largely consistent in finding that an immigration detainee may challenge the conditions of his confinement through a § 2241 petition. *See Carmen R. v. Decker*, Civ. No. 20-3875, 2020 WL 2029337, at *12 (D.N.J. Apr. 28, 2020) (collecting cases); *Thakker v. Doll*, Civ. No. 20-480, 2020 WL 2025384, at *2 (M.D. Pa. Apr. 27, 2020) (collecting cases). Given these considerations, I agree with the line of

cases that have permitted conditions of confinement claims to proceed through a habeas petition and find that Petitioner may pursue his claims through the present petition.[2]

## IV.    LEGAL STANDARD

The relief Petitioner seeks is his immediate release from custody. (DE 1 at 37.) I construe this as his request for a preliminary injunction. *See Hope v. Warden York Cty. Prison*, Civ. No. 20-1784, 2020 WL 1922372, at *2-4 (3d Cir. Apr. 21, 2020); *Ousman D. v. Decker*, Civ. No. 20-2292, 2020 WL 1847704, at *4 (D.N.J. Apr. 13, 2020). In order to obtain a preliminary injunction, a petitioner must provide a "threshold" showing of two critical factors: (1) a likelihood of success on the merits of his claim; and (2) that he is "more likely than not to suffer irreparable harm in the absence of preliminary relief." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). A likelihood of success on the merits requires "a showing significantly better than negligible but not necessarily more likely than not." *See id.* Additionally, "[h]ow strong a claim on the merits is enough depends on the balance of the harms: the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief." *Id.* at 178 (quoting *Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009)). If these two "gateway factors" are met, then the Court considers the remaining two factors which aim to balance the equities of the parties: "the possibility of harm to other interested persons from the grant or denial of the injunction," and "the public interest." *Id.* at 176 (quoting *Del. River Port Auth. v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 919-

---

[2]       I also note that under 28 U.S.C. § 2241, a district court may exercise jurisdiction over a habeas petition when the petitioner is in custody and alleges that this custody violates the constitution, laws, or treaties of the United States. 28 U.S.C. § 2241(c); *Maleng v. Cook*, 490 U.S. 488, 490 (1989). A petitioner may seek § 2241 relief only in the district in which he is in custody. *United States v. Figueroa*, 349 F. App'x 727, 730 (3d Cir. 2009). Thus, this Court has jurisdiction over Petitioner's claims as he is detained within this district and alleges that his detention violates the Constitution.

20 (3d Cir. 1974)). The Court considers, "in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* at 179.

## V. DISCUSSION

Petitioner raises two causes of action in his petition. First, he argues that his continued detention under the conditions at ECCF is unduly punitive and violates his due process rights. (DE 1 at 35.) Second, he argues that Respondents' failure to address his urgent medical needs and provide him with adequate protection from COVID-19 also violates his rights under the Due Process Clause. (*Id.* at 36.) Under the unique set of circumstances presented in this case, I find that Petitioner has met the standard for a preliminary injunction.

## A. Likelihood of Success on the Merits

### i. Conditions of Confinement Claim

Respondents argue that Petitioner cannot establish a successful conditions of confinement claim because he has not shown that Respondents have an express intent to punish him or that his conditions are excessive in relation to the purpose of his detention. (DE 7 at 20.) In support of their argument, Respondents point to the measures taken at ECCF to prevent the spread of COVID-19 and the fact that Petitioner has received treatment for his medical ailments. They add that Petitioner should not be released because he is a danger to the community. (*Id.* at 20–27.) Petitioner responds that ECCF's response to the COVID-19 outbreak has been insufficient, that the facility is not promptly responding to medical requests, and that the government's objective in preventing him from absconding is significantly outweighed by the potential harm to his health. (DE 11 at 13–31.)

An immigration detainee's conditions of confinement claim is properly analyzed under the Due Process Clause of the Fifth Amendment. *See E.D. v. Sharkey*, 928 F.3d 299, 306–07 (3d Cir. 2019) (holding that immigration detainees are entitled to the "same due process protections" as

pretrial detainees). Under the Fifth Amendment's Due Process Clause, "a detainee may not be punished prior to an adjudication of guilt." *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979). In order to determine whether a challenged condition amounts to punishment, a court looks at whether that condition "is reasonably related to a legitimate government objective." *Sharkey*, 928 F.3d at 307. If it is not, then a court may infer "that the purpose of the governmental action is punishment that may not be constitutionally inflected upon detainees *qua* detainees." *Id.* (quoting *Hubbard v. Taylor*, 538 F.3d 229, 232 (3d Cir. 2008)).

Whether a condition of confinement is reasonably related to a legitimate government objective turns on whether the condition serves a legitimate purpose and is rationally related to that purpose. *See Hubbard*, 538 F.3d at 232. A petitioner can demonstrate that a challenged condition amounts to punishment if there is "an expressed intent to punish on the part of detention facility officials," if there is no "alternative purpose to which [the condition of confinement] may rationally be connected is assignable for it," *or* if the condition is "excessive in relation to the alternative purpose assigned [to it]." *See Bell*, 441 U.S. at 538 (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963)).

In the emerging case law that has developed within this district, courts have emphasized certain key factors in determining whether an immigration detainee's conditions of confinement amount to punishment during the current pandemic: namely, the detainee's health and the specific conditions at the facility at which he is detained. *See Carmen R. v. Decker*, Civ. No. 20-3875, 2020 WL 2029337, at *12 (D.N.J. Apr. 28, 2020)*; Thakker v. Doll*, Civ. No. 20-480, 2020 WL 2025384, at *8 (M.D. Pa. Apr. 27, 2020); *Rafael L.O. v. Tsoukaris*, Civ. No. 20-3481, 2020 WL 1808843, at *7-8 (D.N.J. Apr. 9, 2020). In the absence of guidance from the Supreme Court or the Courts of Appeals regarding how to handle conditions of confinement claims during a pandemic, "many

courts have found that insufficient jail action in light of the virus can serve as a basis for release . . . while many others have found that, where the jail takes adequate precautions in light of a given petitioner's medical history, no such relief is warranted." *Cristian R. v. Decker*, Civ. No. 19-20861, 2020 WL 2029336, at *2 (D.N.J. Apr. 28, 2020).

Respondents urge the Court to follow the line of cases which have which denied requests for release made by detainees who exhibit symptoms consistent with COVID-19 or underlying conditions which place them at greater risk of serious illness from COVID-19. (DE 7 at 24–25.) However, I note that in each of these cases, the courts have highlighted the fact that the petitioners did not have any serious underlying medical conditions or that the facility's measures to combat COVID-19 had proven to be sufficient. *See Carmen R. v. Decker*, Civ. No. 20-3875, 2020 WL 2029337, at *11–12 (D.N.J. Apr. 28, 2020) (finding that Petitioner had failed to substantiate his purported medical condition and that the facility's "current measures to combat the spread of COVID-19 in relation to this specific Petitioner's purported medical conditions . . . are not excessive in relation to the government's legitimate purpose."); *Jorge V.S. v. Green*, Civ. No. 20-3675, 2020 WL 1921936, at *4 (D.N.J. Apr. 21, 2020) ("In the absence of a specific and objectively pre-existing serious medical condition which would oblige the jail to take further individualized steps to protect a detainee from the virus, the steps the jail has taken in this matter have more than alleviated any 'deprivation' present in the facilities current conditions."); *see Buleishvili v. Hoover*, Civ. No. 20-607, 2020 WL 1911507, at *6 (M.D. Pa. Apr. 20, 2020) (finding that petitioner had "presented no evidence suggesting that his medical condition makes him uniquely susceptible to either contracting the virus or experiencing severe complications from the disease."); *Verma v. Doll*, Civ. No. 20-14, 2020 WL 1814149, at *5 (M.D. Pa. Apr. 9, 2020) (denying release where petitioner had "not described *his* conditions or *his* treatment during the

COVID-19 pandemic. Without particularized evidence, we cannot conclude that he is being unconstitutionally 'punished' by remaining in detention."). Moreover, as Petitioner points out, several of the cases relied upon by Respondents also involved facilities that had *no* confirmed cases of COVID-19. *See Buleishvili*, 2020 WL 1911507, at *6 (finding no detainee or staff member had yet tested positive at the facility in question); *Brown v. US DHS*, Civ. No. 20-119, 2020 WL 1911506, at *5 (M.D. Pa. Apr. 20, 2020) (finding that the facility had "zero confirmed cases" of COVID-19); *Czerwinski v. Adduci*, Civ. No. 20-10826, 2020 WL 1915326, at *1 (E.D. Mich. Apr. 20, 2020) ("Petitioner has not alleged that any detainees or staff at the Chippewa County jail have tested positive for the COVID-19 coronavirus."); *Cuevas v. PA*, Civ. No. 19-1733, 2020 WL 1911511, at *5 (M.D. Pa. Apr. 20, 2020) ("Cuevas does not allege that anyone at the facility, staff or inmate, has tested positive for COVID-19."); *Sacal-Micha v. Longoria*, Civ. No. 20-37, 2020 WL 1518861, at *2 (S.D. Tex. Mar. 27, 2020) (noting that there were no confirmed cases of COVID-19 in the facility where petitioner was detained).

Taking into consideration the case law, Petitioner's medical vulnerabilities, and the specific conditions at ECCF, I find that Petitioner has shown a likelihood of success on the merits of his conditions of confinement claim. Petitioner has submitted competent evidence that his particular medical conditions place him at "imminent risk for disability and death due to COVID-19 disease." (DE 11-2 at 1.) The unique feature of this claim is that conditions of confinement may amount to punishment because a particular person is medically vulnerable.

I do not say that Respondents have an actual desire to punish the Petitioner. Indeed, they seem to be making great efforts to implement safety measures within the limitations of the institution. It seems, however, that despite these measures, the danger to this Petitioner remains great. There is currently no cure or vaccine; preventive measures are the only option. *See* Ctrs. for

Disease Control and Prevention, *How to Protect Yourself & Others*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited May 7, 2020). Although representatives of ECCF have presented substantial evidence of great efforts to enforce social distancing, the fact remains that there have been a significant number of cases among the staff and inmates. Petitioner, moreover, has submitted substantial evidence that these measures are imperfect, and indeed are almost unavoidably imperfect in an institutional setting: that he is unable to practice social distancing at ECCF, that commonly touched surfaces within the facility are not being cleaned frequently enough, and that he and other detainees have not been provided with facial masks even when they are symptomatic. (DE 11-3; DE 11-4; DE 11-5; DE 11-6; DE 11-8; DE 11-8; DE 11-10; DE 11-11; DE 13-1.)

I raise these factual matters only as an indication that, despite the best intentions and efforts under trying circumstances, issues may continue to exist. It is not necessary to resolve them because my decision will rest primarily on Petitioner's medical condition, and the high danger of serious illness or death in his particular case if the measures should fail to protect him from infection. Here, I place particular stress on Dr. Day's analysis of the Petitioner's already "critically low" oxygen level of 88% and her plausible assessment that his risk is further heightened by obesity and a history of smoking. In short, Petitioner's medical situation is precarious and could be jeopardized by a Covid-19 infection, which of course affects the lungs and depresses oxygen levels.

Thus, while I recognize that the government has a legitimate objective in preventing Petitioner from absconding and ensuring his appearance for his immigration proceedings, Petitioner's present circumstances are excessive in relation to the purpose of his detention. *See Bell*, 441 U.S. at 538. This is especially true given the other alternatives available to ICE to achieve

their objectives. *See Thakker v. Doll*, Civ. No. 20-480, 2020 WL 1671563, at *8 (M.D. Pa. Mar. 31, 2020) ("We note that ICE has a plethora of means *other than* physical detention at their disposal by which they may monitor civil detainees and ensure that they are present at removal proceedings, including remote monitoring and routine check-ins." (emphasis in original)).

### ii.     *Inadequate Medical Care Claim*

Petitioner's second cause of action alleges that Respondents have failed to address his urgent medical needs and to provide protection to individuals, such as Petitioner, who are at high risk of serious harm from COVID-19. (DE 1 at 36.) Petitioner argues that Respondents have demonstrated deliberate indifference towards his serious medical needs by failing to treat him at the onset of his symptoms and by failing to provide him with protective equipment, education regarding the warning signs of COVID-19, or an expedited process to report his symptoms. (DE 11 at 17.) Respondents, however, contend that ECCF has provided Petitioner with a reasonably safe detention environment as required by the Constitution and that Petitioner has not submitted proof that ECCF is incapable of providing adequate medical treatment if he contracts COVID-19. (DE 7 at 29–30.) I do not find that the Petition has a likelihood of success on this claim.

The applicable legal standard for an immigration detainee's inadequate medical care claim is that of deliberate indifference. *See Harvey v. Chertoff*, 263 F. App'x 188, 191 (3d Cir. 2008) (citing *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 581-85 (3d Cir. 2003)); *see also Camacho Lopez v. Lowe*, Civ. No. 3:20-CV-563, 2020 WL 1689874, at *7 (M.D. Pa. Apr. 7, 2020). Thus, to succeed on a claim of inadequate medical care, a petitioner must show: (1) "a serious medical need," and (2) "acts or omissions by prison officials that indicate deliberate indifference to that need." *Natale*, 318 F.3d at 582. The Supreme Court has held that an official demonstrates deliberate indifference where "the official knows of and disregards an excessive risk to inmate

health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). This standard requires that the official was "aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists" and that the official actually drew that inference. *See Natale*, 318 F.3d at 582.

"Where some treatment or proscriptive action designed to alleviate the medical need has been provided and the dispute is over the adequacy of the treatment or preventative steps taken, federal courts 'are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law.'" *Jorge V.S.*, 2020 WL 1921936, at *2 (quoting *Everett v. Nort*, 547 F. App'x 117, 121 (3d Cir. 2013)). Mere disagreement over proper medical treatment generally does not establish deliberate indifference. *See Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004) (citing *Monmouth Cty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987). "[W]hen medical care is provided, we presume that the treatment of a prisoner is proper absent evidence that it violates professional standards of care." *See Pearson v. Prison Health Serv.*, 850 F.3d 526, 535 (3d Cir. 2017); *see also Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990) ("[I]t is well established that as long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights").

I do not find that Petitioner has demonstrated a likelihood of success on the merits of his inadequate medical care claim. Although Petitioner states that he was not assessed or treated at the onset of his symptoms, his medical records demonstrate that he was seen by a medical professional the day after he first complained of a sore throat and a cough. (DE 11-1 at 14–15.) At that appointment, he did not have a fever and his respiratory effort was within normal levels. (*Id.* at 15–16.)  He was prescribed medication to treat his symptoms. (*Id.* at 15.) Petitioner's medical records further indicate that he did not again request a medical visit until April 19, 2020, at which time he stated that the "symptoms in [his] throat were gone," but that he was still experiencing a

cough and a "stuffy nose." (*Id.* at 18.) When Petitioner was seen on April 22, 2020, he was ordered to undergo a chest X-ray and lung exam and was prescribed additional medication for him symptoms. (DE 8 at 2.) Both the chest X-ray and lung exam came back with normal results. (*Id.*; DE 11-2 at 2.) These facts do not appear to demonstrate that prison officials were aware of an excessive risk to Petitioner's and disregarded that risk. Instead, the medical records demonstrate that Petitioner has indeed received treatment for his symptoms.

In support of his argument that he has received inadequate medical care, Petitioner also provides the statement of Dr. Day, which indicates that he received "inadequate medical evaluation of [his] symptoms" and that despite his "concerning" symptoms, he was not referred to a hospital for emergency care, provided a COVID-19 test, placed into quarantine, or provided protective equipment. (DE 11-2 at 1–2.) However, Dr. Day does not expressly state that prison medical officials violated professional standards of care. (*Id.*) Rather, it appears that Dr. Day disagrees with the treatment Petitioner has been provided; a professional's statement that more could have been done is insufficient to establish a constitutional violation. *See Spruill*, 372 F.3d at 235.

Finally, the evidence also demonstrates that Respondents have enacted numerous preventive measures to combat the spread of COVID-19. (DE 7-5.) ECCF has attempted to increase general cleaning of the facility, educate staff and detainees on best practices to prevent contracting COVID-19, and encourage social distancing. (*Id.*) These efforts do not suggest a reckless disregard for the substantial risk of harm that COVID-19 poses.

Accordingly, while Petitioner has not shown a likelihood of success on the merits of his deliberate indifference claim, he has still demonstrated a likelihood of success on his conditions of confinement claim.  Therefore, I find that Petitioner has met the first factor required for the grant of a preliminary injunction.

**B.      Irreparable Harm**

Respondents argue that Petitioner cannot demonstrate that he will be safer at home than at ECCF. (DE 7 at 31.) However, Petitioner's reply indicates that, if released, he will reside with family where he will have his own bedroom to self-isolate for fourteen days and his assigned social worker at the Brooklyn Defender Services will ensure he receives necessary medical care. (DE 11 at 35–36.) The declaration of Dr. Day also provides that the "safest situation" for Petitioner is for him to be released; she supports the commonsense conclusion that group living in a crowded detention center is "an inherently riskier environment." (DE 11-2 at 2.)

Given Petitioner's medical vulnerabilities, and the fact that at ECCF he is unable to adhere to measures which the CDC has recommended as the most effective to thwart the spread of COVID-19, I find that Petitioner has demonstrated that he is more likely than not to suffer irreparable harm if his detention continues. *See Reilly*, 858 F.3d at 179.

**C.      Balancing of the Equities**

Finally, I consider the remaining two factors that aim to balance the equities of the parties: the possibility of harm to other interested persons from the grant or denial of the injunction and the public interest. Respondents assert that there is a significant public interest in the enforcement of the United States' immigration laws and protecting the community, especially in light of Petitioner's pending criminal charges. (DE 7 at 27, 32.) Conversely, Petitioner submits that the significant harm posed to his health and well-being, as well as the public's interest in preserving critical medical resources, outweighs Respondents' interests. (DE 11 at 29.) Additionally, Petitioner states that he has significant ties to the community and that, if released, he will remain closely connected with his attorney at the Brooklyn Defender Services. (*Id.* at 35–36.)

Petitioner does have one conviction on a misdemeanor charge, for which he has completed his sentence. (DE 7-8 at 6.) This Court is not in the business of setting bail for his pending charges; the court in which they are pending has released him on his own recognizance. (*Id.*) Moreover, ICE does not contend that Petitioner is deportable based on any criminal conviction; rather, he is being detained for having entered the United States without authorization. (DE 7-6 at 2.) Petitioner represents that if he is released from ICE custody, he will reside with his family, where he will be able to self-isolate, social-distance, and access adequate care for his medical conditions. (DE 11 at at 35–36.)

Taking into consideration each parties' interests, I believe that Respondents' and Petitioner's concerns can be appropriately balanced by releasing Petitioner to strict conditions including home confinement, as well as electronic and telephonic monitoring. The specific conditions of his release are set forth in the Order accompanying this Opinion.[3] Thus, in balancing the equities, I find that they favor the grant of a preliminary injunction.

## VI.    CONCLUSION

For the foregoing reasons, the petition (DE 1) will be granted insofar as a preliminary injunction shall be issued. An appropriate Order accompanies this Opinion.


DATED: May 7, 2020

/s/ Kevin McNulty

_____

KEVIN MCNULTY
United States District Judge

---

[3]    Respondents' answer requests the opportunity to suggest conditions of release if the Court is inclined to grant such release. (DE 7 at 33.) Petitioner will be released on the conditions outlined in the accompanying Order. If modification is sought, counsel should attempt to agree, but if there is no such consent, the court will entertain letter applications for modification of conditions of release.